UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | DOCKET NO. 3:13-cr-00204-MOC |
| | ) | |
| *Plaintiff,* | ) | CRIMINAL NO. 405-59 |
| | ) | |
| v. | ) | **DEFENDANTS' JOINT MOTION** |
| | ) | **TO DISMISS THE SUPERSEDING** |
| BOGGS PAVING, INC., *et al.*, | ) | **INDICTMENT FOR FAILURE TO** |
| | ) | **STATE OFFENSES AND** |
| *Defendants.* | ) | **INCORPORATED MEMORANDUM** |
| | ) | **OF LAW** |

ROY BLACK
JACKIE  PERCZEK
BLACK SREBNICK KORNSPAN & STUMPF, P.A.
201 SO. BISCAYNE BLVD., #1300
MIAMI, FL 33131
TELE: 305-371-6421
FAX: 305-358-2006
RBLACK@ROYBLACK.COM
JACKIEP@ROYBLACK.COM
*ATTORNEYS FOR CARL ANDREW BOGGS, III (DREW BOGGS)*

BEATTIE B. ASHMORE
BEATTIE B. ASHMORE, P.A.
650 E. WASHINGTON STREET
GREENVILLE, SC 29601
TELE: 864-467-1001
FAX: 864-672-1406
BEATTIE@BEATTIEASHMORE.COM
*ATTORNEY FOR STYX CUTHBERTSON TRUCKING COMPANY, INC. AND JOHN CUTHBERTSON*

JOSEPH PRESTON STROM, JR.
STROM LAW FIRM, LLC
2110 N. BELTLINE BLVD.
COLUMBIA, SC 29204
TELE: 803-252-4800
FAX: 803-252-4801
PETESTROM@STROMLAW.COM
*ATTORNEY FOR BOGGS PAVING, INC.*

JAMES GALYEAN
NEXSEN PRUET, PLLC
227 W. TRADE ST., #1550
CHARLOTTE, NC 28202
TELE: 704-338-5358
FAX: 704-805-4735
JGALYEAN@NEXSENPRUET.COM
*ATTORNEY FOR BOGGS PAVING, INC.*

CHRISTOPHER C. FIALKO
RUDOLF, WIDENHOUSE & FIALKO
225 E. WORTHINGTON, #200
CHARLOTTE, NC 28203
TELE: 704-333-9945
FAX: 704-335-0224
CFIALKO@RWF-LAW.COM
*ATTORNEY FOR GREG MILLER*

i

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION TO MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

JOINT MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.     INTRODUCTION: THE MAIL AND WIRE FRAUD STATUTES
       PROTECT ONLY TRADITIONAL FORMS OF "FRAUD" AND
       "PROPERTY". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       A.     *McNally*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       B.     *Carpenter*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       C.     *Cleveland*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       D.     *Pasquantino*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       E.     *Skilling*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.    OTHER GENERAL CONTRACTORS AND DBEs HAVE NO
       COGNIZABLE "PROPERTY" RIGHTS IN CONTRACTS THAT
       WERE AWARDED TO BOGGS PAVING, EVEN IF BOGGS
       PAVING WON THE AWARDS THROUGH FRAUD. . . . . . . . . . . . . . . . . . . . 11

       A.     An Unsuccessful Bidder For a Government Contract Has No
              "Property" Interest Protected By the Fourteenth Amendment. . . . . . . . . . . . . . . . 11

       B.     An Unsuccessful Bidder For a Government Contract Is Not
              Deprived of "Property" Cognizable By the Mail and Wire Fraud
              Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       C.     The "Right To Control" the Distribution of Government
              Benefits Is Also Not a "Property" Right Absent a Risk of
              Economic Harm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

              1.     *The "right to control" as "property".* . . . . . . . . . . . . . . . . . . . . . . 19

Case 3:13-cr-00204-MOC   Document 101   Filed 07/14/14   Page 2 of 51

2. *The "loan" cases*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III. BREACHING CONTRACTS WITH NCDOT AND SCDOT DOES
NOT DEFRAUD THE UNITED STATES OR THE USDOT. . . . . . . . . . . . . . . . . . . 28

IV. THE SUPERSEDING INDICTMENT MUST BE DISMISSED IF
EITHER THEORY OF FRAUD FAILS TO STATE AN OFFENSE. . . . . . . . . . . . . . . 31

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

iii

# TABLE OF AUTHORITIES

**CASES**                                                                                           **Page**

*Aquilino v. United States*,
    363 U.S. 509 (1960)................................................. 7

*Bd. of Regents of State Colls. v. Roth*,
    408 U.S. 564 (1972)................................................ 12

*Beaver Glass & Mirror Co. v. Bd. of Ed. Of Rockford School Dist.*,
    59 Ill. App. 3d 880, 17 Ill. Dec. 378, 376 N.E.2d 377 (1978)...................... 14

*Becht v. United States*, 403 F.3d 541 (8th Cir. 2005),
    *cert. denied*, 546 U.S. 1177 (2006). ......................................... 32

*Becker Elec., Inc. v. City of Bismarck*,
    469 N.W.2d 159 (N.D. 1991). ................................................ 14

*B.K. Instrument, Inc. v. United States*,
    715 F.2d 713 (2d Cir. 1983)................................................. 13

*Black v. United States*,
    561 U.S. 465 (2010)....................................................... 32

*Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc.*,
    87 Fed. Appx. 227 (3d Cir. 2003). .......................................... 15

*Bradford & Bigelow, Inc. v. Comm.*,
    24 Mass. App. 349, 509 N.E.2d 30 (1987). ................................... 14

*Buckley Constr. Inc. v. Shawnee Civic & Cultural Dev. Auth.*,
    933 F.2d 853 (10th Cir. 1991)............................................... 14

*Carroll F. Look Construction Co., Inc. v. Town of Beals*,
    2002 ME 128, 802 A.2d 994 (2002). ........................................ 14

*Carpenter v. United States*,
    484 U.S. 19 (1987)................................................. 6, 7, 8, 17

*City of Atlanta v. J.A. Jones Const. Co.*,
    260 Ga. 658, 398 S.E.2d 369 (1990). ....................................... 14

iv

**CASES**                                                                                        **Page**

*City of Durant v. Laws Const. Co., Inc.,*
    721 So.2d 598 (Miss. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*City of Scottsdale v. Deem,*
    27 Ariz. App. 480, 556 P.2d 328 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*City-Wide Asphalt Paving, Inc. v. Alamance County,*
    966 F. Supp. 2d 395 (M.D.N.C. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Cleveland v. United States,*
    531 U.S. 12 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 10, 22

*Conway Corp. v. Constr. Eng'rs, Inc.,*
    300 Ark. 225, 782 S.W.2d 36 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Crest Const. Corp. v. Shelby County Bd. of Educ.,*
    612 So.2d 425 (Ala., 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Curtis Ambulance of Fla., Inc. v. Bd. of County Comm'rs,*
    811 F.2d 1371 (10th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Dent v. State,*
    125 So.3d 205 (Fla. 4th DCA 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Equity in Athletics, Inc. v. Department of Education,*
    639 F.3d 91 (4th Cir. 2011),
    *cert denied,* 556 U.S. 1127 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ericsson GE Mobile Comm., Inc. v. Motorola Comm. & Electronics, Inc.,*
    120 F. 3d 216 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Funderburg Builders, Inc. v. Abbeville Co. Mem. Hospital,*
    467 F. Sup. 821 (D.S.C. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Garcia v. San Antonio Metro. Transit Auth.,*
    469 U.S. 528 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Glasgow, Inc. v. Fed. Highway Admin.,*
    843 F.2d 130 (3d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

v

**CASES**                                                                                              **Page**

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)........................................................... 9

*Hedgpeth v. Pulido*,
    555 U.S. 57 (2007)............................................................ 32

*Henderson v. Hertz Corp.*,
    No. A-3776-03T5 (N.J. Super. App. Div. June 22, 2006),
    *2006 N.J. Super. Unpub. LEXIS 2871*..................................... 26

*Heyer Products Co. v. United States*,
    135 Ct. Cl. 63, 140 F. Supp. 409 (1956)..................................... 14

*H & W Contracting, LLC v. City of Watertown*,
    633 N.W.2d 167, 2001 S.D. 107 (S.D. 2001)................................. 14

*Imagineering Inc. v. Kiewit Pacific Co.*,
    976 F.2d 1303 (9th Cir. 1992)............................................... 15

*Indep. Enters. Inc. v. Pitsburgh Water & Sewer Auth.*,
    103 F.3d 1165 (3d Cir. 1997)............................................... 14

*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transp. Authority*,
    23 Cal. 4th 305 (2000).................................................... 14

*Kim Construction Co. v. Board of Trustees of the Village of Mundelein*,
    14 F.3d 1243 (7th Cir. 1994)............................................... 13

*KM Enterprises, Inc. v. McDonald*,
    No. 11-cv-5098 (ADS)(ETB),
    2012 U.S. Dist. LEXIS 138599 (E.D.N.Y. Sept. 25, 2012)
    *aff'd*, 518 Fed. Appx. 12 (2d Cir. 2013). .................................. 13

*Lane v Board of Com'rs*,
    7 Ind. App. 625, 35 N.E. 28 (1893)......................................... 14

*Lanier Construction Co., Inc. v. City of Clinton*,
    812 F. Supp. 2d 696 (E.D.N.C. 2011)................................... 13, 16

*L&H Sanitation, Inc. v. Lake City Sanitation, Inc.*,
    769 F.2d 517 (8th Cri. 1985)............................................... 14

vi

**CASES**                                                                          **Page**

*L & M Enterprises, Inc. v. City of Golden,*
     852 P.2d 1337 (Colo. App., 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lawrence Brunoli, Inc. v. Town of Branford,*
     247 Conn. 407, 722 A.2d 271 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Marbucco Corp. v. City of Manchester,*
     137 N.H. 629, 632 A.2d 522 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*M. A. Stephen Const. Co., Inc. v. Borough of Rumson,*
     125 N.J. Super. 67, 308 A.2d 380 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*McNally v. United States,*
     483 U.S. 350 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Miami Dade County School Bd. v. J. Ruiz School Bus Service, Inc.,*
     874 So.2d 59 (Fla. 3d DCA 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Molloy v. New Rochelle,*
     198 NY 402, 92 NE 94 (1910). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Neder v. United States,*
     527 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

*Offshore Logistics, Inc. v. Tallentire,*
     477 U.S. 207 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.,*
     429 U.S. 363 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Pasquantino v. United States,*
     544 U.S. 349 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Pataula Electric Membership Corp. v. Whitworth,*
     951 F.2d 1238 (11th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Quinn Const. Co., LLC v. King County Fire Protection District No. 26,*
     111 Wn. App. 19, 44 P.3d 865 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Raygor v. Regents of the University of Minnesota,*
     534 U.S. 533 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

vii

**CASES**                                                                                              **Page**

*Regions Bank v. J.R. Oil Co., LLC*,
    387 F. 3d 721 (8th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ricker v. Edmisten*,
    No. 93-1756,
    1994 U.S. App. LEXIS 2022 (4th Cir. Feb. 7, 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 13

*ROK Brothers, Inc. v. Baltimore Co.*,
    No. WMN-09-3423,
    2010 U.S. Dist. LEXIS 37439 (D. Md. April 15, 2010). . . . . . . . . . . . . . . . . . . . . . . . 13

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Sekhar v. United States*,
    133 S. Ct. 2720 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sierra National Ins. Holdings, Inc. v. Altus Finance, S.A.*,
    No. CV 01-01339 AHM (Cwx),
    2001 U.S. Dist. LEXIS 22301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Singletary v. Brown*,
    Civil Action No. 3:11-1449-MBS-BHH,
    2013 U.S. Dist. LEXIS 42478 (D. S.C. Feb. 7, 2013). . . . . . . . . . . . . . . . . . . . . . . . . 16

*Skilling v. United States*,
    561 U.S. 358  (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 10

*Sowell's Meats & Servs., Inc. v. McSwain*,
    788 F.2d 226 (4th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

*Strates Shows, Inc. v. Amusements of America, Inc.*,
    379 F. Supp. 2d 817 (E.D.N.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Stride Contracting Corp. v. Bd. of Contract & Supply*,
    181 A.D.2d 876, 581 N.Y.S.2d 446 (N.Y. App. Div. 1992). . . . . . . . . . . . . . . . . . . . 14

*Stromberg v. California*,
    283 U.S. 359 (1931),
    as modified by *Hedgpeth v. Pulido*,
    555 U.S. 57 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

viii

**CASES**                                                                                                       **Page**

*Sutter Bros. Const. Co., Inc. v. City of Leavenworth,*
    238 Kan. 85, 708 P.2d 190 (Kan.1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Talbot Pav. Co. v. City of Detroit,*
    109 Mich. 657, 67 N.W. 979 (Mich. 1896). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Tel. Assocs. v. St. Louis County Bd.,*
    364 N.W.2d 378 (Minn.1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Tel-Instrument Electronics Corp. v. Teledyne Industries, Inc.,*
    1991 U.S. App. LEXIS 12209 (4th Cir. May 28, 1991). . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Town of Castle Rock v. Gonzales,*
    545 U.S. 748 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. A Parcel of Land (92 Buena Vista Avenue),*
    507 U.S. 111 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Berlin,*
    707 F. Supp. 832 (E.D. Va. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*United States v. Bess,*
    357 U.S. 51 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Blankenship,*
    382 F.3d 1110 (11th Cir. 2004),
    *cert. denied sub nom. Glover v. United States,*
    546 U.S. 828 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

*United States v. Bruchhausen,*
    977 FF.2d 464 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 26

*United States v. Catalfo,*
    64 F.3d 1070 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Cone,*
    714 F.3d 197 (4th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. D'Amato,*
    39 F.3d 1249 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**CASES**                                                                                          **Page**

*United States v. Dinome*,
    86 F.3d 277 (2nd Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*United States v. Evans*,
    844 F.2d 36 (2d Cir.1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Gillion*,
    704 F.3d 284 (4th Cir. 2012),
    *cert. denied*, 133 S.Ct. 2039 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19, 25

*United States v. Goodrich*,
    871 F.2d 1011 (11th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *32*

*United States v. Gray*,
    405 F.3d 227 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19, 25, 26

*United States v. Gurley*,
    415 F.2d 144 (5th Cir. 1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Handakas*,
    286 F.3d 92 (2nd Cir. 2002),
    *cert. denied*, 537 U.S. 894 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 26

*United States v. Henry*,
    29 F.3d 112 (3d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Jackson*,
    608 F.3d 193 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Jefferson*,
    674 F.3d 322 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Kreimer*,
    609 F.2d 126 (5th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-25

*United States v. Leahy*,
    464 F.3d 773 (7th Cir. 2006),
    *cert. denied*, 552 U.S. 811 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Mancuso*,
    42 F.3d 836 (4th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

x

**CASES**                                                                    **Page**

*United States v. Mandel,*
    862 F.2d 1067 (4th Cir. Dec. 7, 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Mittelstaedt,*
    31 F.3d 1208 (2nd Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25

*United States v. One Single Family Residence,*
    894 F.2d 1511 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

*United States v. Pitt,*
    482 Fed. Appx. 787 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Rogers,*
    466 U.S. 475 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

*United States v. Rossomando,*
    144 F.3d 197 (2nd Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*United States v. Rybicki,*
    354 F.3d 124 (2nd Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Sadler,*
    Nos. 12-4450/4458,
    2014 U.S. App. LEXIS 7661 (6th Cir. April 24, 2014). . . . . . . . . . . . . . . . . . . . . . 22, 26

*United States v. Shefton,*
    548 F.3d 1360 (11th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Shellef,*
    507 F.3d 82 (92d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. State of Oregon,*
    671 F.3d 484 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Steffen,*
    687 F.3d 1104 (8th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Tulio,*
    263 Fed. Appx. 258 (3d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*U.S. v. Venneri,*
    736 F.2d 995 (4th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

xi

**CASES**                                                                 **Page**

*United States v. Vollmer & Company, Inc.*,
   1 F.3d 1511 (7th Cir. 1993) ............................................ 23

*United States v. Wright*,
   665 F.3d 560 (3d Cir. 2012) ........................................... 32

*United States v. Yazell*,
   382 U.S. 341 (1966) .................................................... 7

*Walker v. Galt*,
   171 F.2d 613 (5th Cir. 1948) .......................................... 23

*Wisconsin Public Intervenor v. Motrier*,
   501 U.S. 597 (1991) .................................................... 9

*Yates v. United States*,
   354 U.S. 298 (1957) .................................................... 31


**FEDERAL RULES OF CRIMINAL PROCEDURE**

Rule 6(a)(1) ............................................................. 31

Rule 6(f) ............................................................ 31, 32

Rule 12(b)(3) ............................................................. 1


**UNITED STATES CODE**

18 U.S.C. § 371 ....................................................... 2, 31

18 U.S.C. § 1001 ......................................................... 31

18 U.S.C. § 1014 .......................................................... 3

18 U.S.C. § 1341 ..................................................... passim

18 U.S.C. § 1343 ..................................................... 3, 4, 5

18 U.S.C. § 1346 ............................................. 4, 5, 10, 20, 24

xii

**Page**

18 U.S.C. § 1956. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**MISCELLANEOUS**

U.S. CONST. amend. XIV.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 16

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | DOCKET NO. 3:13-cr-00204-MOC |
| | ) | |
| *Plaintiff,* | ) | CRIMINAL NO. 405-59 |
| | ) | |
| v. | ) | |
| | ) | |
| BOGGS PAVING, INC., *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

**INTRODUCTION TO MOTION TO DISMISS**

The two companies targeted by the Government's prosecution, Boggs Paving and Styx Cuthbertson Trucking, are rarities. They are local, family-owned businesses that have earned modest success in a highly competitive industry through hard work and determination. In the process, Boggs Paving and Styx Cuthbertson Trucking have provided substantial benefits to the States and citizens of North and South Carolina. These benefits include award-winning roads that consistently exceeded expectations.

Boggs Paving, Styx Cuthbertson Trucking, and three individuals are accused of fraud in connection with paving projects where outstanding work was done. The accusations stem from rules that attempt to regulate the involvement of disadvantaged business enterprises (DBEs) and small businesses enterprises (SBEs) in Government-sponsored construction projects. Though these rules are presumably designed to promote the utilization of DBEs and SBEs and thereby improve the construction industry, in practice they fail to serve that purpose. The Government is now using those rules to attack Styx Trucking, a fully-functioning minority-owned small business, and Boggs Paving,

xiv

the company that has helped Styx Trucking's success for decades.

Styx Trucking is owned and operated by Defendant John "Styx" Cuthbertson, a 68-year-old African American man. Mr. Cuthbertson founded his company back in the late 1990s. Since then, the company has grown and now employs not only a number of truck drivers, but also Mr. Cuthbertson's son and sister.

Founded in 1994 by Defendant Drew Boggs, Boggs Paving has established itself as one of the premier construction contracting companies throughout the Carolinas. The numerous accolades that the company has received are a testament to its reputation for high-quality and efficient work. At least one of those awards was given to Boggs Paving in connection with a job discussed in the Superseding Indictment. By delivering exceptional road work, Boggs Paving has been able to grow and it now employs hundreds of North and South Carolinians, including dozens of minorities.

The history of John "Styx" Cuthbertson and the Boggs family goes back to the 1980s. Mr. Cuthbertson has worked with Drew Boggs for decades and worked with Drew's father for many years before that. Over the years, Drew Boggs and Boggs Paving have helped Mr. Cuthbertson build a successful DBE trucking company by providing him guidance, infrastructure, and a steady stream of work. In return, Mr. Cuthbertson has provided Boggs Paving that which is so hard to find in a trucking company: reliability, quality, and loyalty.

A key driver of Boggs Paving's success is a commitment to innovation that sets it apart from its large competitors. Over the years, Drew Boggs and Boggs Paving have worked with the NCDOT and SCDOT to develop, test, and implement several new technologies. These technologies have reduced the costs of highway construction, and Boggs Paving has passed those savings on to taxpayers in the form of less expensive work. In addition, the technologies have reduced the

xv

environmental impact of the construction process. Thanks to Drew Boggs and Boggs Paving, several of these technologies are becoming the industry standard.

Legislators designed the DBE and SBE programs to stimulate needy and deserving businesses. But the lack of capable and reliable DBEs and SBEs in trucking, which is critical to paving work, has created a nightmare for companies like Boggs Paving. In the difficult and low-margin highway construction industry, the unreliability and inadequate performance of DBE/SBE truckers can wreak havoc on a job. This often results in untimely and low-quality work and, ultimately, in sharp increases in taxpayer expense.

This is the backdrop for the Government's allegations against Boggs Paving. This case is not about Boggs Paving stealing money from taxpayers or anybody else. This case is not about fake contractors, inflated prices, sham corporations, or taking Government money for work that was never performed or never completed. On the contrary, the roads and projects that Boggs Paving contracted to perform were delivered at or above expectations. What the Government contends is that sometimes Boggs Paving completed projects using trucks owned by Boggs Transport, and that this amounted to fraud because Boggs Paving should have hired a DBE firm to do this work instead.

The following motion to dismiss is based on the Government's flawed theories of "money or property" as well as its theories of "victims" under the mail and wire fraud statutes. Because this case is not about stolen money, sham companies, inflated prices, or work that was never performed, the government has latched on to theories of prosecution that are plainly not supported by the mail or wire fraud statutes or by Supreme Court jurisprudence. For the reasons that follow, the Defendants Boggs Paving, Styx Cuthbertson Trucking, Drew Boggs, Greg Miller, and John "Styx" Cuthbertson move jointly for an order dismissing Counts 1-29 of the Superseding Indictment for

failure to state legally cognizable offenses.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | DOCKET NO. 3:13-cr-00204-MOC |
| | ) | |
| *Plaintiff,* | ) | CRIMINAL NO. 405-59 |
| | ) | |
| v. | ) | **DEFENDANTS' JOINT MOTION** |
| | ) | **TO DISMISS THE SUPERSEDING** |
| BOGGS PAVING, INC., *et al.*, | ) | **INDICTMENT FOR FAILURE TO** |
| | ) | **STATE OFFENSES AND** |
| *Defendants.* | ) | **INCORPORATED MEMORANDUM** |
| | ) | **OF LAW** |

The Defendants Boggs Paving, Inc., Carl Andrew Boggs, III, Greg Miller, Styx Cuthbertson

Trucking Company, Inc., and John Cuthbertson, through undersigned counsel, respectfully move this

Court, pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, for an order dismissing

Counts 1-29 of the Superseding Indictment for failure to state legally cognizable offenses. In support

of this joint motion, the Defendants submit the following:

1. The Superseding Indictment alleges that between 2003 and 2013, Defendant Boggs

Paving, Inc. (Boggs Paving) and the individual defendants "fraudulently obtained millions of dollars

in construction contracts" funded by the United States Department of Transportation, the North

Carolina Department of Transportation, and the South Carolina Department of Transportation

(USDOT, NCDOT, and SCDOT) by "fraudulently certifying" that some of the paving work was

performed by a Disadvantaged Business Enterprise or DBE – in this case, defendant Styx

Cuthbertson and his trucking company Styx Cuthbertson Trucking Company, Inc. – when in fact "the

majority of the payments that STYX supposedly received were ultimately kept" by Boggs Paving

and its affiliates. Sup. Ind., p. 1, ¶ 1.

The precise *economic* nature of this "fraud," however, is amorphous. The Superseding Indictment does *not* allege that the Defendants failed to perform any *economic* terms of its construction contracts. That is, there are no allegations that the Defendants failed to provide the construction work contracted for by USDOT, NCDOT and SCDOT, or that the work was done with defective materials.

2. Instead, the Superseding Indictment charges that the Defendants' alleged conduct defrauded *four* distinct "victims" in *five* distinct ways:

| ALLEGED VICTIM(S) | OBJECT OF ALLEGED FRAUD |
|---|---|
| USDOT, NCDOT, SCDOT | Boggs Paving "obtain[ing] profits" from contracts it "was not entitled to receive" |
| USDOT, NCDOT, SCDOT | Depriving USDOT, NCDOT and SCDOT of their right to "control ... how their money should be spent" |
| Other DBEs | Depriving other DBEs of "profits from subcontracts that were designated for their benefit" |
| Other General Contractors | Depriving other general contractors "from obtaining the profits from lucrative NCDOT and SCDOT contracts" |
| UNITED STATES/USDOT | "[I]mpeding, impairing, obstructing and defeating the lawful governmental function of the USDOT...." |

*See* Sup. Ind., pp. 2, ¶ 3; 15, ¶ 46.A.

3. Count One of the Superseding Indictment incorporates by reference all five theories and alleges that under 18 U.S.C. § 371, the Defendants conspired to (a) defraud the United States by impeding, impairing, obstructing and defeating the lawful governmental function of the USDOT

2

in implementing its DBE program in North and South Carolina; (b) commit wire fraud under 18 U.S.C. § 1343; and (c) commit mail fraud under 18 U.S.C. § 1341.

4.      Counts 2-20 incorporate by reference the first four theories (omitting the conspiracy to defraud the United States) and charge substantive mail and wire fraud violations.

5.      Counts 21-29 charge money laundering offenses under 18 U.S.C. § 1956.  Since the "unlawful activity" that allegedly generated the funds came from the mail and wire fraud charges, the viability of the money laundering charges rises or falls with the viability of the mail and wire fraud charges.  The money laundering forfeiture allegation at the conclusion of the Superseding Indictment likewise rests on the viability of the mail and wire fraud charges.

6.      As demonstrated in the following Memorandum of Law, none of the five alleged theories of prosecution for Counts 1-20 state offenses under the mail and wire fraud statutes. Therefore, Counts 1-29 must be dismissed.[1]

---

[1] Count 30 is the only count of the Superseding Indictment not at issue in this motion. It charges Styx Cuthbertson Trucking and John Cuthbertson with making a false statement in a loan application, in alleged violation of 18 U.S.C. § 1014.

3

<h1 align="center">MEMORANDUM</h1>

## I. INTRODUCTION: THE MAIL AND WIRE FRAUD STATUTES PROTECT ONLY TRADITIONAL FORMS OF "FRAUD" AND "PROPERTY"

Under the federal mail and wire fraud statutes, any person who uses the mail or interstate wire communications to carry out a scheme to defraud for the purpose of "obtaining money or property" is guilty of a felony. 18 U.S.C. §§ 1341, 1343.[2] The mail and wire fraud statutes thus do not criminalize the entire panoply of wrongful conduct in which the mail or wires may have been used. Rather, these statutes penalize only those schemes that deprive their victims of "money or property."

### A.  *McNally*

The history of the mail and wire fraud statutes and judicial efforts to define their outer limits has been addressed by the Supreme Court on several occasions, including in the two seminal opinions of *McNally v. United States,* 483 U.S. 350 (1987) and *Skilling v. United States,* 561 U.S. 358 (2010).  Prior to *McNally*, federal prosecutors had succeeded in convincing courts to read the term "money or property" expansively to encompass "intangible rights." The Supreme Court sought to put an end to the judicially created "intangible rights" theory in *McNally,* but invited Congress to act. Congress did so, enacting 18 U.S.C. § 1346, which crafted a limited intangible-rights theory in

---

[2] For example, the wire fraud statute, 18 U.S.C. § 1343 provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or *for obtaining money or property* by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both....

(emphasis added.) The identical language in each statute is construed *"in pari materia." Neder v. United States,* 527 U.S. 1, 20 (1999).

4

fraud prosecutions by defining a scheme to defraud to include "a scheme or artifice to deprive another of the intangible right of honest services."[3/] Vagueness challenges to this language followed, and the Court resolved them in *Skilling* by limiting Section 1346 to schemes involving bribes and kickbacks.

As the law regarding intangible rights under Section 1346 developed, the Supreme Court also addressed the scope of the term "money or property" in Sections 1341 and 1343. As noted above, *McNally* rejected a judicially created "intangible rights" theory. But *McNally* did not deal solely with honest-services allegations. As is relevant here, *McNally* also examined whether the alleged fraudulent conduct implicated property rights protected by the mail and wire fraud statutes, holding that these statutes only prohibit frauds directly involving tangible "money or property." 483 U.S. at 359. The Supreme Court reasoned that history and precedents construing the term "to defraud" implied a deprivation of something of tangible value. *Id.* at 358. This principle applied even when the government was the "victim" of the alleged scheme because "any benefit which the Government derives from the [mail and wire fraud] statute[s] must be limited to the Government's interests as property holder." *Id.* at 358-59 n. 8.

Moreover, the Supreme Court believed that the mail and wire fraud statutes must be narrowly construed, meaning that "it must be shown that [the defendant's] case is plainly within the statute." *Id*. at 360 (citation omitted). The Court refused to read the statute in a way that "leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials." *Id.* Therefore, the Court declared that § 1341 is

_____

[3/] Section 1346 provides: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

5

"limited in scope to the protection of property rights" and that without "clear and definite language" from Congress, the Supreme Court will not select a "harsher" reading of a criminal statute that expands federal criminal law. *Id.*

**B.** ***Carpenter***

Within months of *McNally,* the Supreme Court again addressed the issue of "money or property" in *Carpenter v. United States,* 484 U.S. 19 (1987). *Carpenter* established that although the mail fraud statute protects only "property rights," the property right need not be tangible. 484 U.S. at 25. The right may be intangible, so long as it is an intangible *property* right that historically has been recognized as such. *Id.* at 26.

*Carpenter* involved a scheme by a Wall Street Journal financial columnist and members of a brokerage firm to use soon-to-be published information to trade stocks and split the profits. *Id.* at 22-23. According to Wall Street Journal rules, the contents of the not-yet-published column were the newspaper's confidential information. *Id.* at 23. Rejecting a claim that the scheme targeted only the Wall Street Journal's intangible rights, the Court found that even though it is intangible, "[c]onfidential business information has long been recognized as property." *Id.* at 26. The Court explained that property rights, whether tangible or intangible, are ordinarily determined by looking to state law. *Id.* at 26, *citing Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001-04 (1984) ("[P]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law").[4] The Court held that while the "honest and faithful services" at issue in *McNally*

---

[4] Numerous "Supreme Court cases ... make clear that the general background rule is that state law will govern property rights, even when the federal government or federal statutes are involved." *United States v. One Single Family*

(continued...)

6

were too ethereal to be cognizable, intangible property rights were within the scope of § 1341. *Id.* at 25.

**C.** ***Cleveland***

Thirteen years after *McNally* and *Carpenter,* the Supreme Court again examined the meaning of "property" in the context of the mail fraud statute.  In *Cleveland v. United States*, 531 U.S. 12 (2000), the Court reviewed fraud charges involving a scheme where the defendants made false statements to obtain video poker licenses from the State of Louisiana. The licenses generated an enormous amount of income for the State through processing fees and a percentage of revenue from each video poker machine. *Id.* at 22. Nevertheless, the State did not lose money from the scheme because the defendants, despite having obtained the licenses through false statements, paid the State their proper share of revenue. *Id.*

*Cleveland* reaffirmed the Court's ruling in *McNally* that, for purposes of a mail fraud prosecution, the object of the fraud must be "property."  The Court again used three guiding principles in determining whether unissued licenses constituted a property right protected by Section 1341 – traditional property analysis, federalism, and the rule of lenity.

---

[4]/(...continued)
*Residence*, 894 F.2d 1511, 1517 (11th Cir. 1990), citing *United States v. Yazell*, 382 U.S. 341, 352 (1966) (state family-property law must do "major damage" to "clear and substantial" federal interests before federal law will override state law); *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 378 (1977) (property ownership governed by law of several states and not general federal law).  Similarly, cases construing tax lien statutes uniformly hold that state law will define what types of interests are "property" that can be attached under federal law.  *See, e.g., Aquilino v. United States*, 363 U.S. 509 (1960); *United States v. Bess*, 357 U.S. 51 (1958); *United States v. Gurley*, 415 F.2d 144 (5th Cir. 1969).  And, state property law concepts have long guided federal forfeiture statues.  *See, e.g., United States v. State of Oregon*, 671 F.3d 484., 490 (4th Cir. 2012) ("Although the forfeiture issue here is a matter of federal law, we generally refer to state law in determining whether a petitioner has a legal interest in forfeited property") (footnote omitted);  *United States v. Shefton*, 548 F.3d 1360, 1364 (11th Cir. 2008) ("The parties agree that we apply state law to determine the nature of the Fund's interest in the Forfeited Property").

First, reiterating its holdings of "property" in *McNally* and *Carpenter*, the Court rejected

government theories of property rights that "stray from traditional concepts of property." 531 U.S.

at 24.[5]  The Court held that traditional property law concepts did not support the government's

theory that the State of Louisiana had a property right in unissued licenses because the State did not

suffer financially from the scheme.  The Court found that whatever nature of "property" right could

be said to have been targeted by the scheme, it was not economic. *Id.* at 22.

The Court also did not agree with the government that *the State's right to control* the

issuance of licenses or the State's right to exclude certain people from obtaining a license was a long

recognized property right. "Even when tied to an expected stream of revenue, the State's right of

control does not create a property interest any more than a law licensing liquor sales in a State that

levies a sales tax on liquor." *Id.* at 23. The Court held that "[a] right to exclude in the governing

capacity is not one appropriately labeled 'property.'" *Id.* at 24. Rather, such rights amount to

"intangible rights of allocation, exclusion, and control";  *i.e.* the State's "sovereign power to

regulate." *Id.* at 23. The Court also explained that, unlike traditional property, a State may not sell

its licensing authority. *Id.*  To further clarify, the Court explained that the object of the fraud must

be "property in the victim's hands."  *Id.* at 26. The Court then concluded that while video poker

licenses might be property in the licensees' hands, they were not property in the hands of the State

that issued them.  *Id.* at 15.

---

[5]*See also Neder*, 527 U.S. at 23-25 (holding that the statutory phrase "scheme or artifice to defraud" applies only to deceptions satisfying the common-law fraud requirement of materiality); *United States v. A Parcel of Land (92 Buena Vista Avenue)*, 507 U.S. 111, 125-127 (1993) (looking to "the common law-rule" to determine when government had a property right in potentially forfeitable assets).

8

Second, the Court in *Cleveland* also relied on principles of federalism to limit the scope of the term "money or property." Rejecting the government's more expansive construction, the Court cautioned against a "sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." *Id.* at 24. If "licenses" constituted "property," the Court feared that the federal mail and wire fraud statutes would suddenly regulate "a wide range of conduct traditionally regulated by state and local authorities." *Id.* at 24-25 (citations omitted). *See generally Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 228-29 (1986) (if Congress had intended to change the "legal climate" regarding applicability of federal law over state law, it "would have taken care to make that [new] requirement explicit").[6]

Lastly, the Court employed the rule of lenity, concluding that "to the extent the term 'property' is ambiguous as placed in § 1341, we have instructed that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Id.* at 25 (citation omitted). Before the harsher alternative is selected, the Court indicated it will "require that Congress should have spoken in language that is clear and definite." *Id.* (citation omitted).

### D. *Pasquantino*

Following *Cleveland,* the Court in *Pasquantino v. United States,* 544 U.S. 349, 357 (2005), held that the right to collect revenue is property in the hands of a government entity. In reaching that

---

[6] The Supreme Court has invoked the "clear statement" rule in a variety of contexts. *See, e.g., Raygor v. Regents of the University of Minnesota*, 534 U.S. 533, 543-44 (2002) (holding that a clear statement was needed to demonstrate congressional intent to extend the statute of limitations for a federal claim against a State in the State's courts); *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991) ("'To give the state-displacing weight of federal law to mere congressional ambiguity would evade the very procedure for lawmaking on which [*Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985)] relied to protect states' interests.'") (citation omitted); *Wisconsin Public Intervenor v. Motrier*, 501 U.S. 597, 607 (1991) (holding that in order to find that a federal statute was meant to preempt other laws the preemptive language must "unmistakably demonstrate[] the intent of Congress" and that "[m]ere silence, in this " context, cannot suffice to establish a 'clear and manifest purpose' to pre-empt").

conclusion, the Court again examined traditional property definitions as well as the common law of fraud and concluded that "money due" as a tax historically had been considered a property right. *Id.* at 356-57. The Court found that a scheme to deprive a government of tax revenue did not target a regulatory interest, as in *Cleveland*, but instead targeted a straightforward economic interest – the entitlement to tax revenue. *Id.* at 357.

      E.     ***Skilling***

     The Supreme Court's most recent analysis of the mail and wire fraud statutes, *Skilling v. United States,* 561 U.S. 358 (2010), invoked most of the same themes in rejecting the government's attempt to expand the scope of 18 U.S.C.§ 1346 beyond traditional forms of bribery and kickbacks. The government urged the Court to accept the view, endorsed by many circuits, that Section 1346 criminalized all "undisclosed self-dealing" in both the public and private sectors. The Court rejected this interpretation, again emphasizing both the rule of lenity and the absence of a "clear instruction" from Congress. 561 U.S. at 410-11. *See also id*. at 411, n. 44 (stating that "[i]f Congress were to take up the enterprise of criminalizing 'undisclosed self-dealing by a public official or private employee,' ... it would have to employ standards of sufficient definiteness and specificity to overcome due process concerns").

     In sum, the Supreme Court's mail fraud jurisprudence makes clear that before allowing a mail and wire fraud prosecution, the Court must assure itself of four principles: *First*, the object of the alleged scheme must be to deprive the victim of "property" which may be tangible or intangible but must be a traditionally recognized property right and not a regulatory interest or other "ethereal" right. *Second*, the "property" must be property in the hands of the victim and not just in the hands of the defendant. *Third*, if the conduct is already regulated by state law, Congress must provide a

10

clear statement that it intended to also criminalize that conduct federally. *Fourth*, any ambiguities in the analysis of these factors must be resolved in favor of lenity.

## II. OTHER GENERAL CONTRACTORS AND DBEs HAVE NO COGNIZABLE "PROPERTY" RIGHTS IN CONTRACTS THAT WERE AWARDED TO BOGGS PAVING, EVEN IF BOGGS PAVING WON THE AWARDS THROUGH FRAUD

As noted at the outset, the Superseding Indictment is explicitly based in part on the theory that Boggs Paving defrauded other general contractors and other DBEs by allegedly tricking the USDOT, NCDOT and SCDOT into awarding construction contracts to Boggs Paving rather than to other general contractors who, in turn, would have employed other DBEs. The fatal problem with this theory of "property" is that losing parties in a competitive bidding system have no cognizable "property" right in the contracts that they did not get, even if the reason they allegedly did not get them was because the winning party obtained the contracts through fraud directed at the governmental entities awarding the contracts.

### A. An Unsuccessful Bidder For a Government Contract Has No "Property" Interest Protected By the Fourteenth Amendment

In construing the Supreme Court's mail and wire fraud jurisprudence, the Fourth Circuit has held that "'[i]t is essential to a conviction under [the mail fraud statute] that the victim of the alleged fraud actually have an interest in the money or property obtained by the defendant.'" *United States v. Gillion*, 704 F.3d 284, 295 (4th Cir. 2012), *cert. denied*, 133 S.Ct. 2039 (2013), quoting *United States v. Gray*, 405 F.3d 227, 234 (4th Cir. 2005). In addition, to constitute "property" in the hands of the victim, the victim must have the right to assign, trade, buy or otherwise dispose of it. 704 F.3d at 295, citing *United States v. Mancuso*, 42 F.3d 836, 845 (4th Cir. 1994). *Cf. Sekhar v. United States*, 133 S. Ct. 2720, 2725 (2013) (to constitute "property" under the Hobbs Act, the property

11

extorted must be "transferable – that is, capable of passing from one person to another") (citations omitted). A never-obtained contract is plainly not "property" under this definition. Therefore, it should come as no surprise that a similar "property" right theory has been consistently been rejected by the courts in lawsuits brought by unsuccessful bidders for public contracts under federal civil rights statutes.

The Due Process Clause of the Fourteenth Amendment provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. In order to state a claim for relief for a violation of procedural due process, a plaintiff must establish (1) that he was deprived of a protected property or liberty interest; and (2) that the procedures provided were inadequate. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571 (1972). Therefore, a plaintiff seeking to establish a procedural due process claim must first demonstrate that he was deprived of a protectable property interest. *See, e.g., Town of Castle Rock v. Gonzales,* 545 U.S. 748, 755-57 (2005); *Roth,* 408 U.S. at 577. As in the mail and wire fraud context, under civil rights statutes, protected property interests are not created by the Fourteenth Amendment itself, but rather must be created or defined by an independent source, usually state law. *Roth*, 408 U.S. at 576-77.

It is well established, and has been for decades, that in order to have a property interest in a benefit a person or entity must have more than a mere "unilateral expectation of it" or abstract need or desire for it. *Equity in Athletics, Inc. v. Department of Education*, 639 F.3d 91, 109 (4th Cir. 2011), *cert denied,* 556 U.S. 1127 (2012). Rather, the plaintiff must have a legitimate claim of *entitlement* to it. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (citing *Roth*, 408 U.S. at 577). Bidding procedures for public contracts, however, "are for the benefit of the public

generally and confer no private rights on the bidder." *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 717 (2d Cir. 1983) (citation omitted). *See also Glasgow, Inc. v. Fed. Highway Admin.*, 843 F.2d 130, 135 (3d Cir. 1988) (noting that "Congress enacted the [FAHA] to advance the public interest and not to benefit individuals contractors"). Therefore, the Fourth Circuit follows the majority rule "the unsuccessful bidders for public contracts have no protected property interests." *ROK Brothers, Inc. v. Baltimore Co.*, No. WMN-09-3423, 2010 U.S. Dist. LEXIS 37439, at **6-11 (D. Md. April 15, 2010) (citations omitted). *See, e.g., Sowell's Meats & Servs., Inc. v. McSwain*, 788 F.2d 226, 228 (4th Cir. 1986) (affirming dismissal of due process claims because disappointed bidder for school lunch program had no property interest); *City-Wide Asphalt Paving, Inc. v. Alamance County,* 966 F. Supp. 2d 395, 400-01 (M.D.N.C. 1997) (rejecting due process claims because disappointed bidder for county landfill contract had no property interest). This principle holds true even when the "unsuccessful bidder" is "the lowest bidder," *Lanier Construction Co., Inc. v. City of Clinton*, 812 F. Supp. 2d 696, 700 (E.D.N.C. 2011), and even where there is a high degree of certainty that a competitor would have been awarded a contract, *Ricker v. Edmisten,* No. 93-1756, 1994 U.S. App. LEXIS 2022, at **5-6 (4th Cir. Feb. 7, 1994) (affirming dismissal of due process claims, holding that plaintiff's "unilateral expectations, however earnestly held, can not transform the Department of Administration's recommendation of his proposal to the Council into a legally binding contract; therefore [plaintiff] has no property interest of which to be deprived."). *See also KM Enterprises, Inc. v. McDonald*, No. 11-cv-5098 (ADS)(ETB), 2012 U.S. Dist. LEXIS 138599, at **6, 35-54 (E.D.N.Y. Sept. 25, 2012) (dismissing civil rights complaint brought by low bidder for a subcontract awarded under the Federal Highway Administration, despite allegations of "bad faith and/or fraud in the approval of the competing subcontractor," holding that "the text and

13

structure of the FAHA demonstrate that it does not give rise to an enforceable, individual right"), *aff'd*, 518 Fed. Appx. 12 (unpublished) (2d Cir.), *cert. denied*, 134 S.Ct. 303 (2013).[7]

An analogous situation occurred in *Strates Shows, Inc. v. Amusements of America, Inc.,* 379 F. Supp. 2d 817 (E.D.N.C. 2005) (Flanagan, J.). In that case, the plaintiff, a family-owned carnival midway company, brought a RICO action against a competing company, who allegedly made illegal campaign contributions to the Commissioner of Agriculture in order to unlawfully secure the award of the right to the midway contract at the state carnival. 379 F. Supp. 2d at 821-22. Plaintiff claimed

---

[7] Other circuits adopting the majority rule that an unsuccessful bidder is not deprived of a cognizable "property" right include: *Ericsson GE Mobile Comm., Inc. v. Motorola Comm. & Electronics, Inc*., 120 F. 3d 216 (11th Cir. 1997) (applying Alabama law); *Indep. Enters. Inc. v. Pitsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1179-80 (3d Cir. 1997) (applying Pennsylvania law); *Kim Construction Co. v. Board of Trustees of the Village of Mundelein*, 14 F.3d 1243, 1247 (7th Cir. 1994); *Pataula Electric Membership Corp. v. Whitworth*, 951 F.2d 1238 (11th Cir. 1992); *Curtis Ambulance of Fla., Inc. v. Bd. of County Comm'rs*, 811 F.2d 1371, 1377 (10th Cir. 1987); *L&H Sanitation, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517, 524 (8th Cri. 1985). Cases adopting the contrary minority rule do so on the basis of the governing state law. *See Buckley Constr. Inc. v. Shawnee Civic & Cultural Dev. Auth.*, 933 F.2d 853, 857 (10th Cir. 1991).

The majority rule has also been followed by the overwhelming number of state courts. *See, e.g., Carroll F. Look Construction Co., Inc. v. Town of Beals*, 2002 ME 128, 802 A.2d 994 (2002); *Quinn Const. Co., LLC v. King County Fire Protection District No. 26*, 111 Wn. App. 19, 44 P.3d 865 (2002); *Sutter Bros. Const. Co., Inc. v. City of Leavenworth*, 238 Kan. 85, 88, 708 P.2d 190, 192-193 (Kan.1985); *Lawrence Brunoli, Inc. v. Town of Branford*, 247 Conn. 407, 722 A.2d 271, 275 (1999); *Conway Corp. v. Constr. Eng'rs, Inc.*, 300 Ark. 225, 782 S.W.2d 36, 41 (1989); *Tel. Assocs. v. St. Louis County Bd.*, 364 N.W.2d 378, 383 (Minn.1985); *Molloy v. New Rochelle,* 198 NY 402, 92 NE 94 (1910); *Stride Contracting Corp. v. Bd. of Contract & Supply*, 181 A.D.2d 876, 581 N.Y.S.2d 446, 448 (N.Y. App. Div. 1992); *Talbot Pav. Co. v. City of Detroit*, 109 Mich. 657, 662, 67 N.W. 979, 981 (Mich. 1896); *Lane v Board of Com'rs,*7 Ind. App. 625, 35 N.E. 28 (1893); *Becker Elec., Inc. v. City of Bismarck*, 469 N.W.2d 159, 160 (N.D. 1991); *Crest Const. Corp. v. Shelby County Bd. of Educ*., 612 So.2d 425, 431 -432 (Ala., 1992); *L & M Enterprises, Inc. v. City of Golden*, 852 P.2d 1337, 1339 (Colo. App., 1993); *Miami Dade County School Bd. v. J. Ruiz School Bus Service, Inc.*, 874 So.2d 59, 65 (Fla. 3d DCA 2004); *City of Scottsdale v. Deem*, 27 Ariz. App. 480, 482, 556 P.2d 328, 330 (1976); *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transp. Authority*, 23 Cal. 4th 305, 317 (2000); *City of Atlanta v. J.A. Jones Const. Co.*, 260 Ga. 658, 659, 398 S.E.2d 369, 371 (1990); *Beaver Glass & Mirror Co. v. Bd. of Ed. Of Rockford School Dist.*, 59 Ill. App. 3d 880, 17 III. Dec. 378, 376 N.E.2d 377, 380 (1978); *M. A. Stephen Const. Co., Inc. v. Borough of Rumson*, 125 N.J. Super. 67, 74-76, 308 A.2d 380, 384-85 (1973); *H & W Contracting, LLC v. City of Watertown*, 633 N.W.2d 167, 173, 2001 S.D. 107, 14 (S.D. 2001). *Accord Heyer Products Co. v. United States*, 135 Ct. Cl. 63, 140 F. Supp. 409, 412-13 (1956) (despite alleged egregious government misconduct, unsuccessful bidder cannot recover lost profits because there was no contract). Counsel have found only two cases in which lost profits were awarded to an unsuccessful bidder. *See City of Durant v. Laws Const. Co., Inc.*, 721 So.2d 598, 604-07 (Miss. 1998); *Bradford & Bigelow, Inc. v. Comm.*, 24 Mass. App. 349, 509 N.E.2d 30, 35, 27 (1987). *Cf. Marbucco Corp. v. City of Manchester*, 137 N.H. 629, 632 A.2d 522, 525 (1993) (lost profits available if *public agency's* conduct was tantamount to bad faith).

14

that it was injured by defendants' racketeering activity in three respects: (1) the failure to award the midway contract to plaintiff, which, but for defendants' activity, would have been awarded to it; (2) costs incurred in the preparation of its bid proposals that were never seriously considered; and (3) legal fees and costs in pursuing a bid protest. *Id.* at 826. Judge Flanagan dismissed the RICO claim, holding that the failure to award the midway contract was an injury to mere "'expectancy interests,'" since "plaintiff had no pre-existing leases or contracts with the State that were terminated due to defendant's activities. *Id.*, quoting *Regions Bank v. J.R. Oil Co., LLC*, 387 F. 3d 721, 730 (8th Cir. 2004). As such, there is no basis upon which to claim that plaintiff lost a property interest when the midway contract or Sky Rides leases were awarded to another party." *Id. See also Tel-Instrument Electronics Corp. v. Teledyne Industries, Inc.*, 934 F.2d 320 (4th Cir. 1991) (table), 1991 U.S. App. LEXIS 12209, *2 (4th Cir. May 28, 1991) ("Tel had 'no cognizable property interest in [the] mere expectation of [the IFF] contract that the government [could have] awarded to any or none...'") (citation omitted); *Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc.*, 87 Fed. Appx. 227, 233 (unpublished) (3d Cir. 2003) (affirming dismissal of RICO claim, in part, for lack of standing where plaintiff claimed it "was denied the opportunity to complete with [the defendant] 'on a fair and honest basis,' and consequently lost income and profits that it would have earned if it had been awarded the ... contract"); *Imagineering Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992) (finding allegation of injury based upon failure to award contract to bidding party too speculative for RICO standing).

Since the USDOT, NCDOT and SCDOT have wide discretion in awarding contracts, no contractor and no DBE have any "entitlement" to any particular contract. Indeed, courts construing both North Carolina and South Carolina law have held that aggrieved bidders for public contracts

15

have no property interest to support a due process claim. *See, e.g., Sowell's Meats*, 788 F.2d at 228 ("we agree that South Carolina law does not confer a property interest on unsuccessful bidders for public contracts"); *Singletary v. Brown*, Civil Action No. 3:11-1449-MBS-BHH, 2013 U.S. Dist. LEXIS 42478 (D. S.C. Feb. 7, 2013) (Report & Recommendation), at **6-7 (same, noting that the court had "found no South Carolina case to the contrary"), adopted, 2013 U.S. Dist. LEXIS 42482 (D. March 26, 2013) (Order & Opinion), at **25-26; *Lanier*, 812 F. Supp. 2d at 700 (holding that under North Carolina law, "[a] disappointed bidder ... cannot claim entitlement to any contract, and no property interest exists on which to base a procedural due process claim"). *See also Funderburg Builders, Inc. v. Abbeville Co. Mem. Hospital*, 467 F. Supp. 821, 825 (D. S.C. 1979) (unsuccessful lowest bidder entitled only to injunctive relief since, "notwithstanding this severe impact, it has been uniformly held that a disappointed bidder may not recover even its anticipated profits")(citations omitted).

### B. An Unsuccessful Bidder For a Government Contract Is Not Deprived of "Property" Cognizable By the Mail and Wire Fraud Statutes

Although the issue has seldom arisen in criminal cases – no doubt because the definition of "property" under the Fourteenth Amendment is so clear on the issue – in those cases where it has arisen, courts have similarly rejected claims by the government that an unsuccessful bidder was defrauded of a cognizable "property" interest in losing a contract through competitive bidding. The closest analogous criminal case is *United States v. Henry*, 29 F.3d 112 (3d Cir. 1994). In *Henry*, two public officials were charged with bank fraud and wire fraud for corruption of the process by which banks were chosen as depositories for funds from various toll bridges. The commission in charge of the funds conducted a competitive bidding process with various banks for their short-term

16

deposits. Two public officials interfered with the process by notifying one bank of the bid information in advance, allowing that bank to outbid the other banks. In return, the public officials received campaign contributions and favorable treatment on loans from the bank. The government asserted that what the other banks lost in this scheme was a fair opportunity to bid in the process. The Third Circuit concluded, however, that this loss of opportunity was not "property" within the meaning of the bank and wire fraud statutes:

> Here, however, the money had not yet been deposited, and there is no way of knowing to which, if any, of the bidding banks it would have gone. Even in a fair process, Bank A might still have won the deposits. The issue, therefore, is whether the competing banks' interest in having a fair opportunity to bid for something that would become their property if and when it was received is in itself property. We conclude that it is not.

> . . . [T]o determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right. *See United States v. Evans*, 844 F.2d 36, 41 (2d Cir.1988) ("That the right at issue ... has not been treated as a property right in other contexts and that there are many basic differences between it and common-law property are relevant considerations in determining whether the right is property under the federal fraud statutes.").

> The competing banks' interest in a fair bidding opportunity does not meet this test. Clearly, each bidding bank's chance of receiving property-the deposits if its bid were accepted-was, at least in part, dependent on the condition that the bidding process would be fair. This condition, which is all that the bidding banks allegedly lost, was thus valuable to them, but it is not a traditionally recognized, enforceable property right. At most, the condition is a promise to the bidding banks from those in charge of the process that they would not interfere with it. It is not a grant of a right of exclusion, which is an important aspect of traditional property. *See Carpenter [v. United States*, 484 U.S. 19, 26-27, 108 S. Ct. 316, 321, 98 L. Ed. 2d 275 (1987)]. Violation of this condition may have affected each bidding bank's possible future receipt of property, but that does not make the condition property.

29 F.3d at 114-15.  *See also Dent v. State*, 125 So.3d 205 (Fla. 4ᵗʰ DCA 2013) (reversing deputy sheriffs' convictions for organized scheme to defraud where defendants manipulated the Sheriff Department's overtime assignment computer system to secure more than their share of overtime assignments, rejecting the theory that other deputies were deprived of "property" through the lost overtime opportunities).

The district court in *United States v. Berlin*, 707 F. Supp. 832 (E.D. Va. 1989), also granted a pretrial motion to dismiss portions of wire fraud charges that were predicated on the theory that the defendants fraudulently deprived other companies of the right to compete fairly for a government procurement contract.  The defendants argued that "the 'other companies' had no property interest in the contract or the right to compete."  707 F. Supp. at 835.  The district court agreed, holding that the government's theory of "property" did not state an offense, characterizing the government's argument as "specious."  *Id.*[8/]  The court then explained its reasoning in detail:

> It seems intuitively obvious that other companies, whoever they may be, have no cognizable property interest in the mere expectation of a contract that the government may award to any or none of them. If all the received bids were too high, in fact, the government would not have awarded the contract at all. All these hypothetical companies lost was the opportunity to compete on a level playing field for a chance at a property right. All of the government's cases were decided before *McNally*, and in that world the indictment would stand. *See, e.g., U.S. v. Venneri*, 736 F.2d 995, 996 (4ᵗʰ Cir. 1984)(upholding mail fraud conviction of defendant who defrauded competitors of their right to unbiased bid competition). Since *McNally*, however, the Fourth Circuit has made it very clear that someone must have been defrauded of a traditional property right, *U.S. v. Mandel*, 862 F.2d 1067 (4ᵗʰ Cir. Dec. 7, 1988)....

---

[8/] The court allowed the government to proceed only on an alternative theory that was expressly included in the indictment – that the government was the intended victim of the fraud, not the defendants' competitors.

18

*Id.* at 835-36. *See also Sierra National Ins. Holdings, Inc. v. Altus Finance, S.A.*, No. CV 01-01339 AHM (Cwx), 2001 U.S. Dist. LEXIS 22301, at **47-50 (C.D. Cal. June 20, 2001) (dismissing civil RICO action based on *Harrison* and *Berlin*).

In light of the foregoing precedent, it is equally "obvious" that other contractors and DBEs "whoever they may be, have no cognizable property interest" in the contracts obtained by Boggs Paving from USDOT, NCDOT and SCDOT, regardless of how Boggs Paving obtained them. Therefore, the Superseding Indictment fails to state offenses on these two theories of fraud as a matter of law.

C.   **The "Right To Control" the Distribution of Government Benefits Is Also Not a "Property" Right Absent a Risk of Economic Harm**

1.   ***The "right to control" as "property"***

The Superseding Indictment also relies on the alternative theory that the victims of the fraud were USDOT, NCDOT and SCDOT and that these public entities were deprived of their "right to control" who would be the beneficiaries of the various construction contracts. Boggs Paving allegedly deprived these public entities of their "right to control" by misrepresenting that it would (or how it would) comply with the DBE requirement. While the Fourth Circuit has recognized that depriving property owners of the "right to control" assets can *sometimes* constitute a "property" right cognizable under the mail and wire fraud statutes, *see, e.g., Gillion*, 704 F.3d at 295; *Gray*, 405 F.3d at 234, in order to do so the misrepresentations at issue must be capable of exposing the owners to at least a *risk* of economic *harm.* But, the "right to control" one's own assets is not "property" independent of the economic terms of the transaction.

19

This principle was explained in clearest detail by the Second Circuit in *United States v. Mittelstaedt*, 31 F.3d 1208 (2ⁿᵈ Cir. 1994). In that case, defendant Johnson was a municipal employee who, while concealing his interest in real estate projects, used his influence on zoning and planning matters to assist the projects. He was later indicted for mail fraud. However, since his conduct occurred *after McNally v. United States*, 483 U.S. 350 (1987), but *before* the enactment of 18 U.S.C. §1346, the district court instructed the jury that government had to prove that Johnson's conduct involved "money or property and not honest services." *Mittelstaedt*, 31 F.3d at 1216. The district court, however, refused to issue Johnson's requested instruction that, to be convicted of mail fraud, Johnson "must have 'placed the Village at an [] *economic* disadvantage ... [in other words] whether such hidden interest caused the Village to purchase the property at a higher cost than it would have otherwise paid....'" *Id.* at 1216-17 (emphasis and bracketing in original). On appeal, Johnson argued that this instruction was required to distinguish a true loss of "property" from a mere loss of "control" that had no economic impact. The Second Circuit agreed with Johnson and rejected the government's contention that the "right of control" standing alone was enough:

> According to the government, it does not matter whether the towns would have suffered some economic loss if the scheme had been successful, because the loss of the "right to control" the expenditure of public funds, through the loss of the ability to make a fully informed decision, is sufficient to constitute mail fraud under § 1341. *We disagree*....

*Id.* at 1217 (emphasis added). After distinguishing cases involving parties with "fiduciary" obligations to each other, the Second Circuit in *Mittelstaedt*, held that "lack of information that might have an impact on the decision regarding where government money is spent, *without more*,

20

is not a tangible harm and therefore does not constitute a deprivation of section 1341 'property.'"

*Id.* at 1217 (emphasis added). The Second Circuit then explained what it meant by "more":

> To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction. [Citation omitted.] To convict, the government had to establish that the omission caused (or was intended to cause) actual harm to the village of a pecuniary nature *or* that the village could have negotiated a better deal for itself if it had not been deceived. The jury should have been so instructed.

*Id.* at 1218 (emphasis in original). Since the trial evidence did not establish whether Johnson's conduct had a tangible impact on the price the village offered for the property or would have affected the village "only because the village would have refused to deal with him on general principles," the Second Circuit reversed Johnson's conviction for the instructional error. *Id.* at 1218. *See also United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) ("schemes that do no more than cause their victims to enter into transactions they would otherwise avoid ... do not violate the mail or wire fraud statutes," rejecting government's argument that a victim's "right to define the terms of the sale of its property" is automatically a property right); *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (recognizing that the right to control "theory is predicated on a showing that some person or entity has been deprived of potentially valuable economic information" and that a victim's right to control is injured by "'the withholding or inaccurate reporting of information that could impact on economic decisions'") (citation omitted).

In the instant case, the government's "right to control" theory is fatally flawed for similar reasons. The alleged misrepresentations about whether or how Boggs Paving would comply with the DBE requirement involved a topic completely divorced from the economic aspects of the contracts (such as, for example, Boggs Paving's financial viability). The alleged misrepresentations

21

concerning the DBE requirement did not cause, and had no capability of causing, a risk of economic harm to either the NCDOT or the SCDOT, since the highways were all constructed according to the specifications in the contracts.

The government has frequently made the same mistake in product diversion cases. For example, in *United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014), the government charged the operators of a pain clinic with wire fraud based on allegations that the owners lied to pharmaceutical distributors when they ordered drugs, using fake names and falsely telling the distributors that the drugs would be used only to treat indigent patients. 2014 U.S. App. LEXIS 7661, at *7. However, since the owners "paid full price for all the drugs ... and did so on time," the Sixth Circuit held that they did not deprive the distributors of a cognizable form of property. *Id.* at *8. "[P]aying the going rate for a product does not square with the conventional understanding of 'deprive.' *Cleveland*, 531 U.S. at 19; Webster's Third New International Dictionary 606 (2002). Stealing the pills would be one thing; paying full price for them is another." *Id.* at *8.

The Sixth Circuit went on to also reject the government's stand-alone right to control theory, *i.e.*, that the distributors "would not have sold had they known the truth." *Id.* The Sixth Circuit correctly equated this theory to "a right to accurate information" theory that was simply too "ethereal" to qualify as a property right without more. *Id.* at *9. Moreover, the Sixth Circuit believed that "[l]ightly equating deceptions with property deprivation, even when the full sales price is paid, would occupy a field of criminal jurisdiction long covered by the States." *Id.* at *11.

Similarly, in *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992), the defendants were charged with 16 counts of wire fraud based on an alleged scheme to smuggle American technology to Soviet Bloc countries. Bruchhausen (or his agents) would purchase equipment from American

22

companies, promising "that all [the] equipment would be used in the United States." 977 F.2d at 466. In fact, however, Bruchhausen – after acquiring the equipment – resold (or "diverted") it to the Soviet Bloc. *Id.* Although the American companies "received the full price for their products," at trial representatives from the American companies testified that "they would never have sold to Bruchhausen had they known the truth." *Id.* at 466-67. The plurality opinion in *Bruchhausen* (Judges Canby and Kozinski) reversed the convictions, holding that the alleged right to "control ... the destination of their products after sale" was *not* a "property" right that was cognizable under the wire fraud statute. *Id.* at 467.[9/] Recognizing that the "rule of lenity" also applied to the government's attempt to stretch the definition of "property" to include "the right to control," the plurality summarized its holding in the clearest of terms:

> We conclude, therefore, that the interest of the manufacturers in seeing that the products they sold were not shipped to the Soviet Bloc in violation of federal law is not "property" of the kind that Congress intended to reach in the wire fraud statute.

*Id.* at 486. *Accord United States v. Vollmer & Company, Inc.*, 1 F.3d 1511 (7th Cir. 1993).

The Second Circuit also rejected a "right-to-control-as-mail-fraud" theory of prosecution in *United States v. Handakas*, 286 F.3d 92 (2nd Cir. 2002), *cert. denied*, 537 U.S. 894 (2002). In that case, Handakas submitted bids on contracts with a municipal entity, the "SCA," in charge of constructing New York City schools. The SCA awarded contracts to the lowest bidder but required, as a condition of the contracts, that the contractor pay workers at the "prevailing rate." 286 F.3d at 96. Handakas submitted a bid that won the contract but he then breached terms of the contract by

---

[9/] Judge Fernandez concurred in the result but disagreed with the reasoning of the plurality opinion contending that a right of control "persists even if others are willing to pay fair market value for the object." *Id.* at 469 (Fernandez, J., concurring), citing *Walker v. Galt*, 171 F.2d 613, 614 (5th Cir. 1948).

23

paying workers at less then half the prevailing rate. The government subsequently indicted Handakas for mail fraud under the theory that the SCA "'had a right to determine how its contracts would be fulfilled,' and that Handakas 'took away that right.'" *Id.* at 101. Due to the SCA's status as a municipal entity, this theory of prosecution was characterized in *Handakas* as an intangible rights theory of fraud, rather than a strict "property" right. However, the Second Circuit not only rejected this theory but found §1346 to be unconstitutional as applied. The Second Circuit reasoned that the worker-wage rate requirement in the bidding process was a contractual term the breach of which could only be remedied in contract law, not tort law. "For present purposes, we see no principled distinction between the duties breached by Handakas and the garden-variety contractual duties usually collected under the rubric of 'representations and warranties.'" *Id.* at 107. The court then concluded that if Handakas' breach could be prosecuted as mail fraud, "[e]very breach of a contract[10/] or state law (committed in the vicinity of a telephone) .... would become punishable as a felony in federal court." *Id.*[11/]

### 2. The "loan" cases

Cases involving false statements made to lending institutions and evidence that the lenders would not have made the loans (even if they were repaid) had they known the truth are distinguishable due to the inherent nature of such institutions. *See, e.g., United States v. Rossomando*, 144 F.3d 197 (2ⁿᵈ Cir. 1998); *United States v. Dinome*, 86 F.3d 277 (2ⁿᵈ Cir. 1996); *United States*

---

[10/] Although the issue was not directly discussed in *Handakas*, the facts suggest that Handakas *always* intended to violate the "prevailing wage" requirement.

[11/] In *United States v. Rybicki*, 354 F.3d 124, 144 (2ⁿᵈ Cir. 2003) (en banc), the Second Circuit sitting *en banc* overruled the portion of *Handakas* that held §1346 unconstitutional as applied. However, a majority endorsed the ultimate conclusion in *Handakas* that "because of the nature of the services to be rendered in *Handakas*, an intangible right to honest services did not arise out of the contract at issue in that case." *Rybicki*, 354 F.3d at 144. The majority opinion simply viewed the constitutional basis for that holding in *Handakas* to be "unnecessary." *Id.*

24

*v. Kreimer*, 609 F.2d 126 (5th Cir. 1980). While these cases involve the lenders' "right to control" their assets, they also have another feature in common. The false representations were material to either the credit worthiness of the borrower or to the economic risk that the lenders were forced to undertake as a result. In *Kreimer*, for example, the borrowers misrepresented (among other things) "the actual purposes of the loans." *See Kreimer*, 609 F.2d at 129. Similarly, in *Dinome*, the defendants inflated their incomes when applying for a mortgage loan and, therefore, "significantly diminished 'the ultimate value of the [mortgage] transaction' to the bank as defined by its standard lending practices, whether or not a subsequent default ensued." *Dinome*, 86 F.3d at 285 (expressly re-affirming *Mittelstaedt*). In *Rossomando*, the court re-affirmed these principles, expressly recognizing that "right of control" loan cases turned on the increase in "credit risk" created by the misrepresentations. *See Rossomando*, 144 F.3d at 201. In all such private sector cases, then, the misrepresentation that violated the "right to control" assets also posed a risk of *economic* loss to the lender. *See also United States v. Catalfo*, 64 F.3d 1070, 1077 (7th Cir. 1995)(recognizing a victim's "right to control its risk of loss").

The Fourth Circuit's "right to control" cases are consistent with this analysis. In *Gillion*, for example, the defendant tricked the victim (CitiCapital) into selling eight trailers by forging a signature on a bill of sale, a deceit which "allowed him to obtain them for below book value." The deception thus had a economic value in addition to affecting CitiCapital's right to control the sale.[12] Similarly, in *Gray*, the defendant murdered a series of husbands and then concealed her role in the murders so that she could still collect the benefits of the decedents' life insurance policies. Although

---

[12] The Fourth Circuit gratuitously added that "[c]oncealing his identity to trick CitiCapital into selling the eight trailers *itself* constituted an interference in CitiCapital's right to dispose of its property." *Id.* at 295 (emphasis added). This dicta should not be divorced from the facts and was not analyzed as a separate stand-alone theory of fraud.

25

the Fourth Circuit stated that insurance companies lost their "right to control" the disposition of the proceeds, it rejected the defendant's theory that it made no economic difference to the companies *who* it paid. "Whether or not the insurance companies paid the proper parties at the end of the day, they would not have been required to pay *anyone* had Gray not killed their insureds. In other words, the insurance companies were deprived of the use of their assets by Gray's accelerating the necessity to pay benefits" and, therefore, deprived the companies "of their 'money' and 'property' by means of a fraudulent scheme." *Gray*, 405 F.3d at 235.

The government's "right to control" theory in the instant case is just as defective as the theories erroneously used in *Sadler*, *Bruchhausen* and, especially, *Handakas*. Indeed, *Handakas* is virtually indistinguishable. There, as here, a governmental entity solicited bids for a construction contract and required, apart from the basic economic conditions, that the contractor comply with a certain policy (hourly rates for construction workers in *Handakas*, minority subcontractors here). Neither contractual term was relevant to the contractor's financial ability to perform the work or the quality of the work demanded by the governmental entity. While, in both situations, the governmental entity would not have granted the contracts "had it known the truth," the deception did not cause and had no ability to cause the governmental entity any real economic harm. In both situations, the governmental entities received the full economic benefits of their bargains. Therefore, the deprivation of a governmental entity's right to control "how its contracts would be fulfilled" is not a "property" right itself.[13/]

---

[13/] *See also Henderson v. Hertz Corp*., No. A-3776-03T5 (N.J. Super. App. Div. June 22, 2006) (per curiam), *2006 N.J. Super. Unpub. LEXIS 2871*, at **9, 13 (dismissing fraud claims against rental car company that also sold car insurance without a license, holding that the failure to disclose the licensure violation was "not a legally cognizable claim" absent allegations that the company either overcharged for the insurance or did not provide coverage and rejecting as insufficient the allegation that consumers were defrauded because they "would not have purchased had [they] been aware that
(continued...)

26

To be sure, the Seventh Circuit in *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006), *cert. denied*, 552 U.S. 811 (2007), found that a contractor's conduct in allegedly cheating the City of Chicago of funds slotted for minority- and women-owned businesses violated the mail and wire fraud statutes, rejecting the argument that all the City lost was a regulatory interest. To the extent that *Leahy* was correctly decided, the decision was the product of a unique set of facts which are wholly different from the allegations in the instant case. The *Leahy* defendants challenged their indictment after pleading guilty to or being convicted of committing a massive fraud on the City of Chicago by obtaining more than $100 million which was specifically earmarked for minority businesses. Unlike here, the indictment in *Leahy* specifically charged that the object of the alleged mail fraud scheme was to obtain more than $100 million by fraudulent misrepresentations. On appeal they argued for the first time, and apparently without any factual support in the district court record, that: 1) they fulfilled their obligations under the contracts that were awarded to them under false pretenses; and 2) the City would ostensibly have paid the same for these services had they been legitimate minority businesses. Thus, the *Leahy* appellants posited that the City lost nothing more than a regulatory interest as a result of their fraudulent misrepresentations.

However, the Seventh Circuit recognized that there was no factual support for the defendants' claims that they performed equivalent services or that the City would have paid the same amount of money to a legitimate minority business. In this regard, the Seventh Circuit noted that the bills for janitorial services appeared to have been excessive and that the defendants had friends and relatives

---

[13]/(...continued)
defendant lacked the appropriate license").

27

on the payroll who did little or no work. 464 F.3d at 779, n. 3. *See also United States v. Tulio*, 263 Fed. Appx. 258, 262 (3d Cir. 2008) (unpublished) (following *Leahy*).

Here, by contrast, the Superseding Indictment does not allege – nor can it allege – that the victims of the alleged scheme suffered a loss of money. This is because Boggs Paving was *the low bidder* on the paving jobs charged in the indictment. Thus, rather than lose money, the States and the DOTs actually *saved* money by awarding the contracts to Boggs Paving.

Moreover, the *Leahy* decision provided absolutely no support for the government's alternative argument that the contracts themselves constituted a traditionally recognized property right. Rather, the *Leahy* court simply and without careful analysis adopted the simplistic reasoning rejected by the majority of other circuits – *i.e.*, that it was enough to allege that the defendants "would not have won the bids" without falsely certifying compliance with the requisite hiring policies. *Id.* at 788. This Court should follow the majority rule and hold that any misrepresentations concerning minority hiring went only to a non-economic, regulatory condition and not to a cognizable economic one.

III.    **BREACHING CONTRACTS WITH NCDOT AND SCDOT DOES NOT DEFRAUD THE UNITED STATES OR THE USDOT**

The conspiracy charge in Count 1 is also fails to state an offense when it alleges that the Defendants conspired to "[d]efraud the United States" by allegedly making various false statements to SCDOT and NCDOT. " *See* Sup. Ind. at p. 15, ¶46. According to Count 1, misrepresentations made to SCDOT and NCDOT "imped[ed], impair[ed], obstruct[ed] and defeat[ed] the lawful governmental function of the USDOT in the implementation, execution, and administration of its DBE program through SCDOT and NCDOT." *Id.* However, for the reasons explained in *United*

28

*States v. Blankenship*, 382 F.3d 1110 (11th Cir. 2004), *cert. denied sub nom. Glover v. United States*, 546 U.S. 828 (2005), misrepresentations by a government contractor to a state DOT (Florida's DOT in *Blankenship*) concerning its DBE hiring practices are "outside the jurisdiction of the federal government." 382 F.3d at 1137.

The defendants in *Blankenship* conspired to obtain highway construction contracts in Florida that were federally mandated to be awarded to DBEs. As explained in *Blankenship*, private construction companies enter into contracts with state DOTs, which "in turn, [are] under contract with the USDOT to adhere to federal specifications." *Id.* at 1136. However, the USDOT contracts and deals exclusively with the state DOTs, not the contractors:

> As the uncontradicted testimony of the Government's witnesses demonstrated, the USDOT dealt exclusively with the FDOT and looked solely to the FDOT to implement its contractual obligations. The USDOT was powerless to "exercise authority" over either [the prime contractor] or the [DBE] defendants. The false statements made by the [DBE] defendants concerned their compliance with the terms of their contract with [the prime contractor] a contract over which the USDOT neither had nor exercised any supervisory power. Consequently, the false statements concerned a matter outside the jurisdiction of the federal government.

*Id.* at 1136-37. In so ruling, the Eleventh Circuit rejected the government's argument that "because the funds with which [the prime contractor] was paid had originated with the federal government, any matters pertaining to the construction project necessarily fall under federal jurisdiction." *Id.* at 1137. The Eleventh Circuit recognized that in *United States v. Rogers*, 466 U.S. 475 (1984), the Supreme Court held that a federal agency has jurisdiction over a matter "when it has power to exercise authority in a particular situation," 466 U.S. at 479, but that USDOT "only has the authority

29

to take action against" the state DOTs – "the recipient[s] of the federal funds – that is, the part[ies] with whom it has contracted." *Blankenship*, 382 F.3d at 1137.

> The fact that the FDOT may have contracted with private firms such as [the prime contractor], or that [the prime contractor] in turn may have subcontracted with the defendants, does not somehow give the USDOT power over agreements between [the prime contractor] and the defendants. Indeed, the Government's witnesses testified at trial that the FDOT, not the USDOT, was responsible for overseeing [the prime contractor]. If the USDOT was displeased with an agreement between [the prime contractor] and the [DBE] defendants, it lacked the power to compel either party to rescind or modify the agreement. The only thing it could do would be to pressure the FDOT under the terms of the FDOT's contract with the USDOT, into pressuring [the prime contractor] into taking some sort of action. This embarrassingly weak and indirect avenue of recourse demonstrates the USDOT's lack of authority, and hence lack of jurisdiction, over [the prime contractor] and the [DBE] defendants.

*Id.* The Eleventh Circuit thus drew a distinction between federal agencies which "exercise power directly over the recipient of its funds" – where federal jurisdiction, therefore, exists – and federal agencies, such as the USDOT, which contract with recipient state agencies under terms which do "not necessarily empower that agency to exercise authority over third parties with whom that recipient interacts." *Id.* at 1138. USDOT is thus the type of agency which "lacks jurisdiction over those third parties and interactions." *Id.* (noting that "[u]nder *Rogers*, jurisdiction does not simply follow federal money wherever it may lead"). Accordingly, the Eleventh Circuit concluded that the false statements made by the defendants "did not fall within the USDOT's jurisdiction." *Id.* at 1141. *Cf. United States v. Jackson*, 608 F.3d 193, 198-99 (4th Cir. 2010) (distinguishing *Blankenship* in upholding false statement charges based on the defendant's submission of false time records to his employer, Northrop Grumman Corporation, a subcontractor for the prime contractor, Computer Sciences Corporation ("CSC"), on a contract with the National Security Agency ("NSA"), where

30

NSA – unlike the USDOT in *Blankenship* – had the "power to exercise authority" over the private parties through its power "to terminate its contract with CSC and to revoke security clearances).

Although *Blankenship* involved false statement charges under 18 U.S.C. § 1001, its reasoning applies equally to the requirement in 18 U.S.C. § 371 that the charged conduct defraud an agency of the United States and not just state agencies who happen to receive federal funding. As *Rogers* and *Blankenship* teach, a state agency's receipt of federal funding is not enough to confer federal jurisdiction unless the federal agency controlling the funding has "authority" over the ultimate recipient of the funds. USDOT does not. Therefore, the first prong ("A") of Count 1 fails to state an offense.

## IV.    THE SUPERSEDING INDICTMENT MUST BE DISMISSED IF EITHER THEORY OF FRAUD FAILS TO STATE AN OFFENSE

Even if the Court were to conclude that one, but not all, of the various "property right" theories relied upon in the Superseding Indictment is cognizable, dismissal would still be required *unless* the grand jury was instructed that at least 12 of the grand jurors – the minimum required to indict under Rule 6(f) of the Federal Rules of Criminal Procedure[14] – would have agreed on the *same* theory and that they voted to indict on *the legally cognizable* theory. In other words, as in general petit jury verdicts, if it is not clear from the instructions issued to the grand jurors that at least 12 agreed to indict on a cognizable theory, then the Court must assume to the contrary, *i.e.*, that they voted to indict based on one of the impermissible theories.

This principle is clearly established in analyzing petit jury verdicts. Under *Yates v. United States*, 354 U.S. 298 (1957), and *Stromberg v. California*, 283 U.S. 359 (1931), as modified by

_____

[14] Under Rule 6(a)(1), a grand jury may consist of between 16 and 23 members but under Rule 6(f) "may indict only if at least 12 jurors concur."

31

*Hedgpeth v. Pulido*, 555 U.S. 57 (2007) (per curiam), when a general verdict may have rested on a ground that was legally defective, "*Stromberg* prevents a reviewing court from presuming that the jury convicted on an alternative theory permitted by the [law], merely because the evidence was *sufficient* to support the [legally permissible] ground." *Becht v. United States*, 403 F.3d 541, 548 (8th Cir. 2005) (emphasis in original), *cert. denied*, 546 U.S. 1177 (2006). Where one or more of the alternate means of conviction is improper as a matter of law, then general verdict principles require reversal unless the government can establish that the error was harmless beyond a reasonable doubt. *Black v. United States*, 561 U.S. 465 (2010); *Hedgpeth*, 555 U.S. at 61; *United States v. Jefferson*, 674 F.3d 322, 361 (4th Cir. 2012); *Becht*, 403 F.3d at 549. *See also United States v. Pitt*, 482 Fed. Appx. 787, 793 (4th Cir. 2012) (unpublished) (reversing mail fraud conviction where jury was instructed on both pecuniary theory and defective honest services theory under plain error standard in part because the theories had "different elements with respect to intent"); *United States v. Wright*, 665 F.3d 560, 570-72 (3d Cir. 2012) (vacating honest services wire fraud conviction where verdict encompassed both bribery theory and defective conflict-of-interest theory).

While grand jurors need not be unanimous on the basis for returning an indictment, under Rule 6(f) at least 12 members of the grand jury must agree that the defendant commit a crime. If what the grand jurors believed was a crime was, in fact, not a crime as a matter of law, then an indictment is subject to dismissal pretrial. *See, e.g., United States v. Steffen*, 687 F.3d 1104 (8th Cir. 2012); *United States v. Goodrich*, 871 F.2d 1011, 1015 (11th Cir. 1989). And, if less than 12 relied on a legitimate theory, then the resulting indictment would violate Rule 6(f). Accordingly, the Court should grant the accompanying motion for a limited review of the grand jury transcripts to determine whether the grand jury instructions were "general" or were specific enough to ensure that a majority

32

(the same majority) necessarily relied upon a legally cognizable theory. *Cf. United States v. Cone*, 714 F.3d 197 (4th Cir. 2013) (relying on instructions requiring a special, rather than a general, verdict to affirm conviction).

### C<span>ONCLUSION</span>

For all of the foregoing reasons, the Court should dismiss Counts 1-29 of the Superseding Indictment.

Respectfully submitted,

/s/ Roy Black
Roy Black
Jackie Perczek
**Black Srebnick Kornspan & Stumpf, P.A.**
201 So. Biscayne Blvd., #1300
Miami, FL 33131
Tele: 305-371-6421
Fax: 305-358-2006
rblack@royblack.com
jackiep@royblack.com
*Attorneys for Carl Andrew Boggs, III*

/s/Beattie B. Ashmore
Beattie B. Ashmore
**Beattie B. Ashmore, P.A.**
650 E. Washington Street
Greenville, SC 29601
Tele: 864-467-1001
Fax: 864-672-1406
beattie@beattieashmore.com
*Attorney for Styx Cuthbertson Trucking Company, Inc. and John Cuthbertson*

/s/Joseph Preston Strom, Jr.
Joseph Preston Strom, Jr.
**Strom Law Firm, LLC**
2110 N. Beltline Blvd.
Columbia, SC 29204
Tele: 803-252-4800
Fax: 803-252-4801
petestrom@stromlaw.com
*Attorney for Boggs Paving, Inc.*

/s/James Galyean
James Galyean
**Nexsen Pruet, PLLC**
227 W. Trade St., #1550
Charlotte, NC 28202
Tele: 704-338-5358
Fax: 704-805-4735
jgalyean@nexsenpruet.com
*Attorney for Boggs Paving, Inc.*

/s/Christopher C. Fialko
Christopher C. Fialko
**Rudolf, Widenhouse & Fialko**
225 E. Worthington, #200
Charlotte, NC 28203
Tele: 704-333-9945
Fax: 704-335-0224
cfialko@rwf-law.com
*Attorney for Greg Miller*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed via CM/ECF, this 14th day of July, 2014.

/s/Roy Black
Roy Black

34